by Kurt Bode versus Ernie Horner, appellant cross appellee by Tamara Meister. Good morning. May it please the Court, Counsel. My name is Tamara Meister, and I represent the appellants, Mr. Ernie Lyle Horner. Your Honors, in this case, equitable principles apply, and we're asking that you reverse the trial court's decision and find that both are valid affirmative defenses in this case. First, laches bars the wife's claim to the husband's pension, and it's clear in this case that both elements of laches are satisfied. First, there was certainly a lack of diligence by Mrs. Horner, and there is a serious injury or prejudice as a result of that delay to Mr. Horner. As to the lack of diligence, in this case, the wife waited almost 19 years before attempting to enter a quildro. Under no circumstances can such a delay be described as a diligent assertion of her claim. The parties were divorced in January 1994, and the husband retired in January 2001. The wife admitted that she had heard on and off for almost a decade that the husband had retired. However, the date of her actual knowledge of when husband retired is irrelevant, because retirement status is not necessary for a quildro to be entered. It's common practice in Tazewell County, and a good one at that, for quildros to be entered concurrently or immediately following the entry of a divorce decree. The wife chose not to file for an entry of quildro, and she didn't file a petition for entry of a quadro until 2012, which in and of itself was an improper petition. She didn't file for a motion for entry of quildro until May 2013, 19 years after the parties had divorced, and almost 12 years after the husband's retirement had commenced. This is a serious lack of diligence by the wife. As to the second element of latches, there is certainly a serious injury or prejudice as a result of that delay. Mr. Horner in this case faces simply financial ruin. He will lose almost all of his assets, and a reduction of income by 54% to one that is simply insufficient to support his standard of living. He lives a very modest lifestyle, and has budgeted his finances on the premise that wife did not claim an interest in his pension. Wife has been and continues to... Actually, the divorce decree gave the wife an interest in his pension. It did, your honor. It did give her a right... And so, if she doesn't find out about it... If she doesn't find out about his retirement, you mean? Yeah, right. Well, your honor, as I recently said, knowledge of when an employee retires is not necessary for a quildro to be entered. An alternate payee should file that paperwork immediately if they decide that they... What was the practice 20 years ago? Well, your honor, the practice 20 years ago, prior to 2006, quildros actually required a specific dollar amount to be listed on the quildro. Percentages or formulas were not accepted. In 1994, it's a percentage that she's granted in that second bifurcated judgment. So the common practice was that you had to contact the employer, get a statement from them as to what they anticipate the pension to be, and still file the quildro based upon that information from the employer. Mrs. Horner did not do any of this, ever. The first we heard that she indicated that she wanted a portion of her pension was 19 years after the parties had divorced. In this case, the wife has been and continues to be in a comfortable financial state subsequent to the divorce. The wife inherited property totaling approximately $500,000. She was granted a life estate interest and a trust, and she collects Social Security. Husband receives his monthly pension and some minimal net rental income, such that Mr. Horner's net income is approximately $2,400 per month, while Mrs. Horner's net income is approximately $2,000 per month. If Mr. Horner had to repay approximately $140,000 in retroactive pension benefits, he would have to sell off all of his investment properties, which constitutes his only nest egg in the event of imminent health bills. In other words, his nest egg was what was supposed to go to his ex-wife. Well, Your Honor, he lives... I mean, that's what you're saying. It's not even that much, Your Honors. He has a couple of very modest, very modest homes that he owns in Menier. Several of those are under rent-to-own contracts, such that he doesn't even have a real equity interest in those. So the value of his estate is not even what he owes to Mrs. Horner that the trial court ordered that he owes her. There was nothing required of her to trigger her entitlement to the pension percentage, was there? Well... She wasn't required to do anything. The marital settlement agreement is silent. It does not reference that a quildro should enter. And a portion... There's no other... It's silent as far as any requirement that she has to do to trigger her entitlement to the pension once it starts getting paid. There is a provision where he has a right to do something to get a review, and he chose never to talk about, never to do anything about that, correct? Well, Your Honor, he... And that's because it's a good time probably for me to bring this up. Mr. Horner adamantly contends that the parties agreed that if the wife received an inheritance, that the husband would keep his retirement in full. And the intent of that party's in referencing that oral agreement is quite plain, especially if we take into account that in the first judgment for dissolution of marriage, which was entered in 1991 and then shortly vacated thereafter, in that judgment, there was an explicit reference to the fact that a quildro would enter for 50% of the pension. You know, how ambiguous is the language that the issue of whether the plaintiff shall receive or continue to receive one half of said pension may be reviewed if the plaintiff receives an inheritance from her mother? I think that that is what makes this language extremely ambiguous, because the case law assumes, as you said, that she will receive the pension. It's an equity interest that she was granted at the time of that judgment, such that she's the co-owner of that pension at the time of the judgment. However, that language altered that general principle such that the parties agreed otherwise. The word however, in the actual termination of the marital settlement agreement, links the first and the second sentence such that they shall be construed together. And it indicates that there's a possibility other than what was described in the first sentence. So the parties were clearly taking into consideration that the wife might not receive a portion of the pension. And how's that determined? It's silent, Your Honor. It says the court retains jurisdiction for that purpose. So you think the wife would petition to see if it's going to continue, or is the husband the one who's going to do that? Well, it doesn't specifically say either way. It doesn't specifically say who shall notify who of retirement, or who shall notify who of an inheritance, the amount thereof. It's to what factors the trial court should take into consideration if someone did bring a review. And that's another reason why we think that we need to look at the intent of the parties in making this agreement in the 1994 judgment for dissolution of marriage. There's no express mention in the second bifurcated judgment that a quildro should enter, as was in the first judgment. And so this purposeful omittance from the first judgment to the second judgment is an indicator that the parties intended for the wife's interest in the pension to be contingent, such that she would not receive a portion of the pension if she received an inheritance. Well, and you're getting that from the word review? Yes, Your Honor. And also the intent of the parties. Mr. Horner testified as to what he believed he was signing. He was of the understanding that the oral agreement was properly encompassed in the 1994 judgment. And he testified that it was the spirit of the agreement, essentially, that both parties would end up in a somewhat equal position in their later years for a cash flow purpose. And the conduct of the parties over the past 19 years is such that the parties are in a somewhat equal position right now. He has kept his pension. She has kept her inheritance. And the parties' net income and their estates are very comparable. And so looking at the parties' conduct in support of what their intent was in the 1994 judgment, they've both been acting in accordance with that agreement that was made in 1994. How was his conduct? He was... He didn't say anything about the pension, did he? I'm sorry? Was there anything said about the pension? That he was receiving it? He testified that it was discussed multiple times in front of Mrs. Horner. They have children together, grandchildren together. They have a relationship where they still attend holiday functions with one another for many, many years since their divorce. And so yes, his retirement status was discussed in her presence. His collection of the pension was discussed in her presence many, many times over the years. And she, in fact, testified that she had heard on and off for almost a decade that he had Going back to latches to the second element, the serious injury or result of the delay, the wife would earn a windfall, in this case, of approximately $140,000, and her monthly income would skyrocket to about $3,000 per month. Again, the parties would be moved from a somewhat equal position to wife being placed in a far better financial situation. This is clearly not an equitable outcome. The wife ran out of money from her inheritance, from the $500,000, and so her conduct over the past 20 years indicated, however, that her intent was not to assert her claim to Mr. Horner's pension. The actions of both of the parties over the last 20 years is proof that the underlying intent of the marital settlement agreement was such that if wife received inheritance, she would not receive a portion of the pension. Again, the intent of the 1994 property distribution was so that an equitable living standard would be achieved by both parties in their later years. Wife expected to receive a meaningful inheritance. She did receive that meaningful inheritance, and the parties logically reasoned that she would not need a portion of the husband's pension. The intent of the parties was fairness to each in terms of future cash flow, and that agreement is what governed both of the parties' actions for almost 20 years. The pension benefits awarded pursuant to a divorce decree are to be ordering a distribution of properties and money judgment subject to the 20-year statute of limitations pursuant to section 2-1602 of the Illinois Code of Civil Procedure. Here, wife waited almost 19 years for just short of the statute of limitations kicking in, and husband faces financial ruin. The equitable policy underlying an award of latches is that courts are reluctant to come to the aid of a party who has knowingly slept on his rights to the detriment of the opposing party. That's exactly what we have in this case, and latches is applicable. As to the doctrine of equitable estoppel, that's also applicable in this case, and bars the wife's petition to enter a coiled row. That wasn't pled as an affirmative matter until the motion that we consider argued after. I believe, Your Honor, it was raised in the defendant's post-trial memorandum as item number 29. It's not specifically labeled as equitable estoppel, but Mr. Horner's attorney at that time does touch on all of the elements, and all of the evidence came Isn't that an affirmative matter that must be pled under the pleading rules in Illinois? I believe, Your Honor, for argument's sake, that it was properly pled in the defendant's post-trial memorandum. But it's pled as a defense to the other action, and how can it be properly pled in a motion we consider? Because the pleadings were never amended. The pleadings were never amended as a matter for when we came in on the case in the motion to reconsider. That's true. But we believe that all of the evidence came in for the equitable estoppel, and it was properly raised as an affirmative defense at the trial court's level in the event that this court disagrees, and obviously equitable estoppel would not be able to be taken into consideration by Your Honors. However, we do believe that Mr. Horner reasonably relied on Mrs. Horner's inaction in making a claim on his pension. Wife, by her actions, remaining idle for 19 years, induced the husband to rely on her conduct, and his reasonable reliance was to his detriment. Had he not relied on the fact that she didn't file a petition for entry of Quildreau within either those first seven years after their divorce, before his retirement, or shortly after his retirement, then he wouldn't be facing financial ruin today. His reliance was reasonable, especially when taking into consideration the party's intent in their dissolution of marriage and accompanying oral agreement, that both parties wanted to be fair and take into consideration the cash flow of each party in the years to come. Thank you. Your Honors, equitable estoppel is an applicable defense in this case and bars the wife's recovery because she has, by her conduct and statements, induced the husband to rely, to his detriment, on her conduct. The reliance was reasonable given the considerable time lapse between the divorce and the petition for entry of Quildreau, coupled with the existence of the oral argument between the parties. It would be inequitable to grant the relief requested, as to do so substantially rewards the wife, who should not be heavily rewarded for her inexcusable delay. She should be estopped because she induced husband to rely on their agreement, and he did reasonably rely on her conduct. It's reasonable to interpret, Your Honors, from the inaction of both of the parties and the language in the marital settlement agreement, that there was an agreement as to the contingency regarding distribution of the pension based upon wife receiving an inheritance. The arrangement was and continues to be equitable for both parties. Wife complied with the agreement until she depleted the majority of her inheritance, and she now seeks to retract that agreement. We respectfully contend that this court should not allow such a substantial inequity to occur, and we ask that you reverse the trial court's decision and find that both legitimate and equitable estoppel are valid affirmative defenses in this case. Thank you. Thank you, Ms. Meister and Mr. Cook. May it please the court. My name is Kirk Bode. I represent the appellee Judy Horner. I'm here to respectfully request that this court affirm the trial court's ruling and yet also to reverse on the award of interest.  and yet also to reverse on the award of interest. The trial court entered a judgment for Judy for her share of the pension benefits but denied any request by her for interest on that money that Lyle had the use of over the many years. Legally, that's a matter of discussion, isn't it? Yes, it is. The standard isn't brief, but it has to do with what is fair and equitable under all the circumstances. We just believe because Ernie had the use of Judy's money for all those years, and she didn't have the use of that money, it would be fair that he should pay a reasonable interest rate because he had the use of the money, she didn't have the money, and there's value in the use of money over the years. Understanding it's in the discretion of the trial court, however. A couple points to be brought up as to who knew what did. Counsel made the comment that it was... It's a pretty big standard to say abuse of discretion, isn't it? Yes, it is. I understand that. However, when you look at what's fair and the position that Ernie finds himself in now because he's enjoyed the use and benefit of Judy's money over the years, that maybe statutory interest at 9% might be an injustice, but some time value use of the money that Judy should have. We're about not doing anything for 19 years. And I guess that cuts both ways because neither party did anything for 19 years, and who should have done something during that 19 years? That gets to what the trial court's interpretation of the marital settlement agreement, which should be interpreted like a contract that says Judy, the plaintiff, shall, there's the word shall have, won't have equity, and I'll pensionary charge that if it's belonging to Ernie. Then it says, however, and the issue of whether she should receive or continue to receive, the interlineation there is important because this shows this was very carefully crafted and very well thought out by the parties and needs to be given the meaning as it's read. And then he says the review, the pension may be reviewed. So what does Judy have to do to get... I always find it interesting when they say very clearly crafted by the parties and the whole debate here is about this language. The issue is to look, I guess, at the intent. And when you have the stark difference between shall, that Judy, she shall receive, and Ernie may review, the question would beg itself, who has the keys to review? It would be Ernie. And Judge Mayer, in her ruling, talks about there's nothing Judy has to do to get a property right, but if Ernie wants to review it, he's the one that needs to bring it to the court's attention. Why would Judy bring it to the court's attention? Wasn't it in fact brought to this court's attention? Yes, after Judy filed her petition to get her pension benefits started, he then filed a petition to review. And the trial court then got into everybody's financial circumstances and then denied that to be done after weighing where everybody was at financially. So he did get his review that he asked for, but he waited 19 years to ask for review. So there's delay on his part. To some extent, he perhaps, using the word stopper, he should be stopped from going back in time because he set on his right, his right to review it for the court to consider what any pension, Ernie inheritance that she would have received. So when you look at the language of the marital settlement agreement, it's very different. It's cracked. It says the word shall is there and the word is may there. And Judge Mayer, in her ruling, really said the burden is on Ernie to bring this back to court. If he wants to avoid having to pay for the pension benefits because it says shall receive, that would interpret a review before she received it. Or it says then it's lined in there or continue to receive. That gives him the right to review it before the pension starts or after the pension starts, all the way up to 2013. And that's the first time that he brought it to the attention of the court. And so he set on his rights. The focus is on Judy sitting on her rights, but she had a property interest that said shall. He has the right to review, and he didn't seek that out for all those years. So the language of the marital settlement agreement is very clear, and Judge Mayer found it to be very clear and unambiguous that Judy has a property right subject to Ernie's right to review if he chooses to review. As she pointed out, he had the key to the courthouse. He could have filed a petition to review and brought the matter to the attention of the court. He didn't do so until she brought the matter back up in 2013. What kind of notice did she get? The counsel in her argument indicated that the retirement was discussed between the parties, but the record, and I reviewed it again, talks about that everyone in Minear, a small town, everyone in Minear knew what was going on in Minear. Therefore, she had to know. It was kind of a small town. Everybody knows what's everybody's business. He said they went to a few family gatherings, but on C-103 of the record, he says he never discussed it with Judy. He never brought it up. He never raised it. There's no e-mail. I don't know if there was e-mail back then. No letters, no notes, no e-mails. Because these people had no contact with each other except they would go to a family get-together, but he says it was never discussed. He never notified her that he retired. She said she heard rumors that you might hear in a small town. But then again, who has the burden here? Does Judy have the burden when she is awarded a property interest? Or does Ernie have the burden because he has the right to seek review to bring it to the attention of the court? That's a good question. That was not in the order, that review. Would he still have a responsibility to disclose? A lot of lawyers write that in. Well, in the divorce decree... He should disclose when she gets back to work or he gets attention. As we know... That wasn't done here, obviously. If the quilter was interred when it should have been interred at the time of the divorce, he wouldn't have this problem. He wouldn't have to notify her. Yes. Maybe the question is who has to notify who? Does she have to notify when she receives inheritance or does he have to notify her? And does she... And this gets, I suppose, to the latches and equitable estoppel. They both fail because there is no prejudice to Ernie. The worst prejudice is he has to pay back the money he received that was hers. In the classic Blissett case, as a child support case. But if you're called upon to pay back what you improperly received, that's not prejudice that qualifies for latches or equitable estoppel. So there's no harm or prejudice to Ernie to now have to pay back Judy what she rightfully should have had. We think it should be with interest. So if anything, if he has to pay her back the principal, he still is the beneficiary by having the use of her money like an interest-free loan for 19 years. Or really, since he started receiving his pension, which was in 2000, it's really 12 or 13 or 14 years as we sit here today is how long he's been getting his pension. The 19 years goes back to the date of the judgment back in 1994. And then Ernie raises, as kind of a last-ditch effort, he raises this oral agreement position that he once wanted the trial court and now wants you and the appellate court to sanction that there was some oral agreement that they had before the first judgment for dissolution of marriage. And he says, well, Judy didn't act because that was proof that we had this oral agreement. Yet this oral agreement argument is ludicrous and kind of an afterthought, a last-minute effort by him to not have to pay Judy back her money, because he says in the record the oral agreement predated, was before the first judgment. And if there was an oral agreement, why didn't it show up in judgment number one in 1991? Why didn't it show up in judgment number two in 1994 if there was this oral agreement that he wants everybody to enforce? And to enforce non-judicial oral agreements requires, I would submit to the court, a tremendous burden of proof, clear and unequivocal evidence that there was an agreement. All's we have is Ernie saying there was an agreement, I think, at the kitchen table that predated the first divorce. There was a prove-up in this case. There was a prove-up. Yes. To get it approved. Yes. And the first judgment, back at the time of the divorce judgment, the first one was vacated because Ernie was in the hospital, and the second one, everybody signed off on that, and it was an open court with counsel and everything else. And Ernie only mentions this alleged oral agreement after Judy files this as an effort to not have to pay Judy back the money that he's been benefiting from for 14 years. So it really, we're here seeking fairness, equity, that Judy, who didn't get her share of his pension benefits, now be allowed to get her pension benefits. As we sit here today, there is no quid pro in effect awarding her her interest. She ought to be getting her share of Ernie's pension. And the fact that Ernie used the money over the years to his benefit and got a condo and I think a swimming pool and some other things that's in the record here, it's difficult to feel sorry for Ernie since he benefited from using her money for all these years. And as the trial court pointed out accurately, he's the one that should have come back to review, not Judy. So we want to point the finger at Judy and what she didn't do, but given the language of the court putting the onus on Ernie to have to do something, perhaps the focus should be on where were you all these years, Ernie? But he was getting her money and maybe he was hoping it would never come back, so he continued to enjoy her money, invest her money apparently, and he has a lifestyle that's been dependent upon her money and now cries prejudice or harm because he would have to pay back to her the money that he's been using all over all these years. When he knew what the judgment said, that she had a right in this, he was just hoping I think that nothing would ever happen. And with regard to that a quildro wasn't entered, a quildro is a vehicle to implement a property interest. That's what it is. She was awarded her property interest here. There was no quildro entered at the time or really not. There isn't one as we sit here now. But that just is a vehicle to implement a property interest. That's all I have unless the court has some questions. Thank you. Thank you, Mr. Borden. And Ms. Meister. Thank you. First briefly I would like to discuss the issue brought on cross appeal, the interest. In remarriage of carriers cited by both parties, it holds that the 9% statutory interest on money judgments do not apply to dissolution actions with the exception of child support. We don't have a child support interest in this case. We have an interest in a pension. Equitable considerations govern the award of an interest in a dissolution proceeding. In a situation where interest is warranted by equitable considerations, an interest should be awarded. However, interest should be disallowed if such an award would not comport with justice and equity. And in this case, it's clearly not equitable for Mrs. Horner to receive interest on the arrearage. Mrs. Horner waited almost 19 years to make a claim for her portion of the husband's pension. The parties were divorced in January 1994. Mr. Horner retired in January 2001. Wife didn't file her petition for entry of quildro until May 2013, again, almost 19 years after the parties divorced. Again, it's common practice in Tazewell County for the alternate payee to prepare and file the quildro. Not only did Mrs. Horner fail in doing this, she failed to make her claim for almost 12 years after Mr. Horner retired. Mr. Horner faces financial ruin as a direct result of Mrs. Horner's delay, and Mr. Horner reasonably relied on the conduct of both of the parties, and he relied on the fact that they had an oral agreement wherein she would not claim a portion of the pension if she received an inheritance. The 19-year delay cannot be rewarded with an interest allocation. The decision to award interest on the dissolution judgment as to a pension is a discretionary matter for the trial court, and if this court upholds that Mr. Horner owes a retroactive payment to Mrs. Horner, an award of interest should not enter. Your Honors, a lot of emphasis was placed at the trial level and in the judge's order on whether the husband notified wife that he had retired. However, again, the date of the husband's retirement has no effect whatsoever on the wife's ability to claim an interest in the husband's retirement benefits. When asked why she waited until April of 2012 to initially bring her claim, the wife stated, because he was supposed to have notified me for one thing, which was never done. However, there is no requirement for a retiree to notify an alternate payee of retirement in order for the alternate payee to receive an interest to which she is entitled. Additionally, there was no provision within the marital settlement agreement requiring husband to notify wife of the date of his retirement. Not properly addressed at the hearing was whether wife notified husband of her receipt of an inheritance, the amount thereof, or the date of her notification to him. The order entered by the trial court states that husband was well aware of the inheritance and that he disagrees with the management skills of the trustee. In fact, however, the husband never testified as to when he acquired knowledge as to wife's inheritance. Surely, if this court finds from the language that it was husband's obligation to file for a review of the pension issue, then it's equally incumbent upon the wife to notify husband that she had received an inheritance, and the wife made no attempt to do so in this case. I think additionally, Your Honors, we have to continue to look at the conduct of both of the parties from the date of the divorce until the petition for entry of a quildro in May 2013. Neither of them took any action with regard to the pension or the inheritance issue, which only substantiates Mr. Horner's claim that there was an oral agreement and the true intent of the parties was that she would not receive a portion of the pension if she received an inheritance. Their conduct tells us that. Their conduct speaks louder than words, louder than the words in the marital settlement agreement. Both of them were present at the second prove-up, right? I believe so, Your Honor. I believe they were. Mr. Bode discussed the position that Mr. Horner finds himself in. Your Honors, he's in a dire position. He has a small set of properties that he owns. He has no savings account. He has no 401K or IRA or any other type of retirement. He has no medical insurance because he's uninsurable. The only money that this man has to his name is his monthly pension income and a couple of these houses that are quite modest that he owns. The serious prejudice is that he faces financial ruin, not just that he would have to pay her $140,000. We have to look at all of the facts. The child support cases that Mr. Bode is referring to carries a very important public policy along with that. We don't have child support policy in this case, and we have to take into consideration that it's not just a large lump sum of money that would be hard for anyone to pay back, especially for Mr. Horner if it financially ruins him for the rest of his life. He faces imminent medical bills. He's had hip replacements, knee replacements. He has fused vertebrae in his lower back, arthritis. The list goes on and on, and he's facing more surgeries. He's not going to be able to support himself having to sell off his entire estate and only having an income of $1,000 per month. Thank you. It's certainly not equitable for this court to uphold the trial court's decision, and we would ask that you reverse and hold that latch as an equitable stop or reply in this case. Thank you. Thank you. Mr. Bode, you do have three minutes to rebut or vote if you choose to take that time. It's solely on the interest, as I understand it. The standard on the issue of interest is cited under the Finley case that interest should be allowed where warranted by equitable consideration and should be disallowed if such an award would not comport with justice and equity. We believe that interest is appropriate by equitable principles, and to not award Judy interest on her money wouldn't comport with justice and equity because that would continue to reward Ernie and give him the benefit of the use of Judy's money over 14 years. Judy has been denied what has been rightfully hers for 13 years, and all she wants is to be paid back with a reasonable sum rate of return. To do that would not be punitive to Ernie because he's not punished, because the fact that he's got used to his money, I suppose, he would see that as punishment, but just to make him pay back money that he has wrongfully retained over the past several years isn't punitive to him, it's equitable. And accordingly, there should be a reasonable interest rate to allow Judy to recoup the benefit of the money she should have had over the last 14 years. I understand the standard is abuse of discretion, but I think that equity and fairness would militate in favor of an award of interest here. Thank you. Thank you, Mr. Porter. Thank both of you for your arguments today. We will take this matter under advisement, but I charge a written disposition within a short period. We're now at a short recess.